# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| ALEXANDRIA NEAL-ADAMS,<br><br>Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>Defendant. | No. 17-CV-1018-CJW<br><br>**MEMORANDUM ORDER AND OPINION** |

The claimant, Alexandria Neal-Adams ("claimant"), seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-34 (Act). Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that claimant was not disabled. For the reasons that follow, the ALJ's decision is hereby **affirmed**.

## I. BACKGROUND

The Court adopts the facts as set forth in the parties' Joint Statement of Facts (Doc. 18) and, therefore, will summarize only the pertinent facts. Claimant was born in 1988, was 24 years old when she allegedly became disabled, and was 27 years old at the time of the ALJ's decision. (AR 23, 24).[1] Claimant completed the ninth grade and does not have a General Equivalency Diploma (GED). (AR 38). She has no past relevant work, never having engaged in any substantial gainful employment activity. (AR 23).

---

[1] "AR" refers to the administrative record below.

On December 18, 2012, claimant applied for supplemental security income, alleging a disability onset date of December 18, 2012. (AR 12). In 2014, the Commissioner denied claimant's application initially and on reconsideration. (AR 128-30, 132). On March 10, 2016, ALJ Margaret Carey held a hearing at which claimant and a vocational expert testified. (AR 31-68). On May 4, 2016, the ALJ found claimant was not disabled. (AR 12-24). On June 1, 2017, the Appeals Counsel denied claimant's request for review of the ALJ's decision, making the ALJ's decision final and subject to judicial review. (AR 1-4).

On August 2, 2017, claimant filed her Complaint in this Court. (Doc. 3). Claimant and the Commissioner both consented to proceedings before a United States Magistrate Judge, including final disposition of the case, and the Honorable Linda R. Reade, United States District Judge, reassigned this case to the undersigned. (Doc. 16). By May 5, 2018, the parties had submitted their briefs (Docs. 19 & 22), and by May 23, 2018, the Court deemed this case fully submitted and ready for decision. (Doc. 23).

## II. DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual has a disability when, due to his physical or mental impairments, "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). If the claimant is able to do work which exists in the national economy but is unemployed because of inability to

get work, lack of opportunities in the local area, economic conditions, employer hiring practices, or other factors, the ALJ will still find the claimant not disabled.

To determine whether a claimant has a disability within the meaning of the Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial" work activity involves physical or mental activities. "Gainful" activity is work done for pay or profit, even if the claimant did not ultimately receive pay or profit.

Second, if the claimant is not engaged in substantial gainful activity, then the Commissioner looks to the severity of the claimant's physical and mental impairments. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. An impairment is not severe if it does "not significantly limit [a] claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707.

The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). These include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.*; *see also* 20 C.F.R. § 404.1521.

Third, if the claimant has a severe impairment, then the Commissioner will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the presumptively disabling impairments listed in the

3

regulations, then the claimant is considered disabled regardless of age, education, and work experience. *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) and the demands of his past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). If the claimant can still do his past relevant work, then he is considered not disabled. (*Id.*). Past relevant work is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. § 416.960(b). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite [ ] her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (citations and internal quotation marks omitted). The RFC is based on all relevant medical and other evidence. The claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled.

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. The Commissioner must show not only that the claimant's RFC will allow him to make the adjustment to other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591. If the claimant can make the adjustment, then the Commissioner will find the claimant not disabled. At Step Five, the Commissioner has the responsibility of developing the claimant's medical history before making a determination about the existence of a disability. The burden of

persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## III. THE ALJ'S FINDINGS

The ALJ made the following findings at each step:

At Step One, the ALJ found that claimant had not engaged in substantial gainful activity since December 18, 2012, the alleged onset date of her disability. (AR 14).

At Step Two, the ALJ found that claimant had the following severe impairments: "affective disorder, anxiety disorder, personality disorder, obesity, Wolff-Parkinson's-White syndrome, essential hypertension, asthma and supraventricular tachycardia with heart murmur." (*Id.*).

At Step Three, the ALJ found that none of claimant's impairments met or equaled a presumptively disabling impairment listed in the relevant regulations. (AR 15).

At Step Four, the ALJ found claimant had the residual functional capacity to perform sedentary work with the following limitations:

> [Claimant] cannot climb ladders, ropes or scaffolds. She can occasionally climb ramps and stairs. She is unlimited in balancing and stooping, but cannot kneel, crouch or crawl. She needs to avoid tasks that require excellent vision defined as the ability to see and discriminate all but extremely detailed or fine work. She can tolerate only occasional exposure to extreme cold, heat, humidity, fumes, odors, dust, gases and other pulmonary irritants. She can tolerate no exposure to moving mechanical parts or unprotected heights. She needs the ability to elevate he [sic] legs 6 inches off the ground. The claimant retains the mental capacity for simple, routine, repetitive work in a low stress environment defined as having only occasional simple work related decisions and few if any changes in the work setting. She will need a break every 2 hours that can be accommodated by routine breaks and lunch. She should have no interaction with the public and only occasional interaction with coworkers but no tandem or team tasks or tasks where one production step depends upon another.

(AR 16). Also at Step Four, the ALJ found that claimant had no past relevant work. (AR 23).

At Step Five, the ALJ found that considering claimant's age, education, work experience, and residual functional capacity, there were jobs in significant numbers in the national economy that claimant could perform. (*Id.*). These included Sorter, Assembler, and Packer. (AR 24). Therefore, the ALJ found that claimant was not disabled. (*Id.*).

## IV. THE SUBSTANTIAL EVIDENCE STANDARD

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645 (citations and internal quotation marks omitted). The Eighth Circuit Court of Appeals explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citations and internal quotation marks omitted).

In determining whether the Commissioner's decision meets this standard, a court "consider[s] all of the evidence that was before the ALJ, but . . . do[es] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). A court considers both evidence that supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The Court must "search the record for evidence contradicting the [Commissioner's] decision and

give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the Court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The Court, however, "do[es] not reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (quoting *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the Court "find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the Court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the Court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The Court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion" (citation omitted).).

## V. DISCUSSION

Claimant argues that the ALJ erred in two ways. First, claimant argues the ALJ's mental residual functional capacity finding was not supported by substantial evidence. (Doc. 19, at 12-29). Second, claimant argues the ALJ's finding on how high claimant could elevate her legs was not supported by substantial evidence. (Doc. 19, at 29-37). The Court will address each argument in order.

### A. *Claimant's Mental Residual Functional Capacity*

Claimant argues that the ALJ's residual functional capacity assessment at Step Four was flawed because it was not supported by substantial evidence. Claimant argues that the ALJ improperly discounted the opinions of claimant's treating professionals, failed to inquire into the reason for claimant's noncompliance with treatment, and failed to develop the record. (Doc. 19, at 14-15).

Regarding claimant's mental health, the ALJ acknowledged that claimant suffers from mental health impairments. (AR 21). The ALJ related that claimant alleged "she did not get along well with others and had difficulty interacting with others." (*Id.*). The ALJ found it significant, however, that claimant failed to attend the recommended STEPPS programs and did not continue with therapy, and that claimant had not sought mental health treatment since early 2013. (*Id.*). Finally, the ALJ noted that claimant married and attended school, which the ALJ found were inconsistent with the disabling mental health impairment claimant described. (*Id.*).

The ALJ gave great weight to the State Agency psychological mental assessments, noting that those consulting psychologists "found claimant was capable of simple, routine and repetitive work with the ability to maintain a schedule, but would be limited to no interaction with the public and occasional interaction with coworkers." (AR 23). The ALJ found claimant retained "the mental capacity for simple, routine, repetitive work in a low stress environment defined as having only occasional simple work related decisions and few if any changes in the work setting" and have "no interaction with the public and only occasional interaction with coworkers, but no tandem or team tasks or tasks where one production step depends upon another." (AR 16, 21).

### i. *Treatment Providers' "Opinions"*

Claimant argues that the ALJ improperly discounted the opinions of claimant's treating professionals, but there are no such opinions in any way pertaining to her

functional limitations due to mental health impairments. Claimant has a very limited mental health treatment history. She was subject to a consultative examination in 2009 by Dr. Robert Buchanan, but that was not part of her mental health treatment. (AR 414 17). In any event, that consultation predated the alleged onset of disability by three years. Claimant was the subject of another consultative examination by Dr. Don White, Ph.D., on November 14, 2013. (AR 785-788). Again, Dr. White was not a treatment provider. (*Id.*).

The first record of any mental health treatment is on November 16, 2012. (AR 550).[2] Claimant sought treatment at the Vera French Mental Health Center from November 16, 2012, until March 2013 (a period of four months), where she was seen by Licensed Social Worker Carla Mohr and Carolyn Seifert, M.D. (AR 542-681). The treatment notes reflect a diagnosis of schizoaffective disorder, Post-Traumatic Stress Disorder, and Borderline Personality Disorder. (AR 552). The records generally reflect that the treatment providers prescribed medications and treatment with which claimant was often noncompliant. The treatment records reflect GAF scores between 40 and 43. (AR 546, 553, 555, 558, 681). The records do not reflect, however, any opinion as to work-related limitations. It is "significant that no physician who examined [claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work." *Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000).

Claimant cites the GAF scores for the proposition that claimant's GAF scores must mean that claimant has major impairments in several areas, such as work. (Doc. 19, at 16-17). Claimant further argues that "[i]t is clear that Dr. Seifert diagnosed [claimant] at the least functional range of serious symptoms and that her opinion agrees with the

---

[2] The notes from this first visit reflect that claimant told the treatment provider that she had been treated for depression and had been off medication for four months (*Id.*), but there is no medical records extant that support that assertion. Moreover, claimant concedes that "[t]here is no record of treatment from 2009 until 2012." (Doc. 19, at 16).

opinion of Carla Mohr about the severity of her symptoms." (Doc. 19, at 17). Claimant then concludes that the ALJ's finding that claimant had moderate limitations means, "[a]s a matter of simple logic," that the ALJ did not reflect the "serious limitations noted by her treating psychiatrist." (Doc. 19, at 25).

A GAF score is not, however, an opinion of a treatment provider regarding work-related limitations, moderate, serious, or otherwise. The GAF scale is "a numeric scale used to rate social, occupational, and psychological functioning on a hypothetical continuum of mental-health illness." *Mabry v. Colvin*, 815 F.3d 386, 391 n.6 (8th Cir. 2016). "The scale ranges from zero to one hundred." *Id*. The introductory paragraph of the GAF scale instructs a clinician to "consider psychological, social, and occupational functioning on a hypothetical continuum of mental illness." DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, 34 (4th ed., text rev. 2000). GAF scores have no direct correlation, however, to the severity standard used by the Commissioner. *Wright v. Colvin*, 789 F.3d 847, 855 (8th Cir. 2015) (citing 65 Fed. Reg. 50746, 50764–65). Rather, as the ALJ noted, a GAF score "is a subjective assessment by an examiner" that "relies on various factors including the claimant's subjective statements" and is, therefore, "a 'snapshot' and fails to provide a longitudinal view of the claimant." (AR 22). *See Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010) (stating that a GAF score is a "subjective determination that represents the clinician's judgment of the individual's overall level of functioning."). That is especially so when, as here, the records reflect GAF scores for only four months between November 2012 and March 2013. Finally, "[t]he most recent edition of the Diagnostic and Statistical Manual of Mental Disorders discontinued use of the GAF scale." *Mabry* at 391 n.6. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 16 (5th ed. 2013).

An ALJ should nevertheless consider GAF scores, along with other evidence, in determining a claimant's RFC. *Pate-Fires v. Astrue*, 564 F.3d 935, 944-45 (8th Cir.

2009). Here, the ALJ did consider the GAF scores. (AR 22). The ALJ also, however, considered at length and in detail claimant's mental health treatment records, the consultative mental examinations, claimant's daily activities, and the other medical evidence in concluding that she should afford the GAF scores little weight. *Mabry*, 815 F.3d at 391 ("GAF scores may be relevant to a determination of disability based on mental impairments. But an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it."). Therefore, the Court finds the ALJ properly considered and weighed the import of claimant's limited GAF scores in light of the totality of the evidence. *See Jones*, 619 F.3d at 972–74 & n.4 (distinguishing from *Pate–Fires* because the claimant did not have a lengthy history of low GAF scores, scores were inconsistent with other evidence in the record, and the ALJ explained why he was discrediting the scores).

In any event, the GAF scores standing alone simply do not constitute an opinion by any treatment provider regarding claimant's functional limitations. Therefore, the Court finds that the ALJ did not improperly fail to give proper weight to the opinions of a treatment provider regarding claimant's limitations.

### ii. *Claimant's Non-Compliance*

Claimant also argues that the ALJ failed to consider why claimant was non-compliant with mental health treatment. (Doc. 19, at 24-26). Claimant argues, in essence, that the ALJ should have concluded that claimant's failure to seek mental health treatment and failure to comply with treatment regiments when she did seek treatment, must be the result of her mental illness. Although it is true that the failure to seek or comply with mental health treatment can be due to the mental illness itself, (SSR 16-3p), that is not always the case.

Contrary to claimant's argument, the ALJ did address the reasons for claimant's non-compliance. The ALJ noted that claimant demonstrated a "bad attitude during her

11

mental health consults," but that claimant "was often found to be cooperative and pleasant with her other providers." (AR 21). The ALJ concluded that claimant was capable of acting appropriately with other medical providers. (*Id.*). The ALJ also reasoned that claimant's daily activities, including getting married and attending school, were inconsistent with the conclusion that claimant was so severely mentally ill that she could not seek or comply with treatment. (*Id.*).

Upon the Court's own review of the limited mental health records, the Court finds they support the ALJ's conclusions and reasoning. The records reflect that claimant often simply had a poor attitude. (AR 559 (noting a "'chip on the shoulder,' disrespective [sic] attitude," responding to her treatment provider with "a hateful, you-must-be-an-idiot tone of voice accompanied by eye rolling"); 660 (describing claimant as having a "smart-alecky attitude, but not as 'in-your-face' as at her last visit"); 661 (describing claimant's attitude as "uncooperative, Resentful and demanding"); 666 (describing claimant as having an "'I ain't gonna take no shit from anybody' attitude")). On other occasions she was cooperative. (AR 663, 675, 678, 681). The medical records show that upon examination claimant's reasoning was generally "fair" and her thought processes logical, which suggests she was capable of seeking and complying with treatment. (AR 552, 555, 661, 664, 668, 675, 678, 681). The record also reflects that claimant at the same time she was receiving mental health treatment, she got married and attended school (AR 559, 663), conduct that is inconsistent with a person suffering a mental illness to such a degree that it impaired her from seeking mental health treatment or complying with treatment instructions. Finally, the Court's own review of the medical records pertaining to claimant's physical health care reflects that she was capable of seeking medical care and complying with treatment instructions, and could and did act appropriately with others.

There is simply nothing in the record from which the ALJ should have concluded that claimant's failure to seek mental health treatment or comply with treatment

instructions was a result of her mental illness. Therefore, the Court finds the ALJ did not err in assessing the reasoning for claimant's failure to seek or comply with mental health treatment.

### iii. *Development of the Record*

Claimant argues that the ALJ should have ordered a consultative mental health examination given the absence of any mental health treatment or examinations after November 2013. (Doc. 19, at 28). Dr. White performed a comprehensive psychological examination in November 2013. Dr. White diagnosed claimant with schizoaffective disorder, posttraumatic stress disorder, and personality disorder. (AR 788). Dr. White concluded that claimant had "adequate Adaptive Behavioral Functioning," and

> Evidence of psychosis, some evidence that claimant could be harmful to others if provoked. Claimant is oriented as to time, place and person. No impairment in Immediate, Recent or Remote Memory Functioning. Claimants Fund of Information, Ability to do Calculations, Ability to Analyze and Synthesize Data appear to be functional. Abstract Thinking and Judgment are impaired.

(AR 788).

Claimant bears the burden to provide evidence to support her claims. *Baldwin*, 349 F.3d at 556. On the other hand, an ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo*, 377 F.3d at 806. But, an "ALJ is required to order medical examinations and tests only if the medical records presented do not give sufficient medical evidence to determine whether the claimant is disabled." *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010). Thus, the proper inquiry for this Court is not whether the ALJ should have ordered a consultative examination; rather, it is whether the record contained sufficient evidence for the ALJ to make an informed decision. *See Payton v. Shalala*, 25 F.3d 684, 686 (8th Cir. 1994). Finally, it is appropriate for this Court to remand a case

for failure to fully develop the record only when there is a showing of unfairness or prejudice. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).

The record in this case contained sufficient evidence for the ALJ to make an informed decision without ordering another consultative examination. After Dr. White's report in 2013, claimant's case proceeded through administrative appeals and the ALJ's hearing. Claimant was given an opportunity at each step along the way to allege a change in her condition, but did not do so regarding mental health. (AR 267, 273, 291). Moreover, there are no medical records showing any change in claimant's condition. The ALJ relied on Dr. White's report and the other medical evidence and non-medical evidence regarding claimant's mental health impairments. These records contained sufficient evidence for the ALJ to make an informed decision regarding claimant's mental residual functional capacity. Claimant has made no showing that a failure to order another consultative examination, when there is no indication of a change in her condition since the last one, was unfair or prejudiced her. Therefore, the Court finds the ALJ did not err in failing to order another consultative mental health examination.

In summary, the Court finds that substantial evidence in the record as a whole supports the ALJ's mental health residual functional capacity assessment.

### B. *Claimant's Leg Elevation*

Claimant argues that substantial evidence does not support the ALJ's finding that allowing claimant to elevate her legs six inches is sufficient to relieve her swelling. (Doc. 19, at 29). Claimant testified that she needed to elevate her legs to hip level (AR 17), which claimant asserts would preclude all employment. (Doc. 19, at 29). Claimant argues that the ALJ's residual functional capacity assessment, therefore, should have included the need for claimant to elevate her legs to hip level. Claimant concedes that "[t]here is no medical evidence in this record to indicate how high [claimant] must elevate her legs in order to reduce the swelling." (*Id.*, at 34). Claimant argues, therefore, that

the ALJ again should have developed the record to determine how high claimant had to elevate her legs to eliminate swelling. (*Id.*, at 35-36).

The ALJ reviewed claimant's medical history in some detail, including records pertaining to her leg swelling and the need for her to elevate her legs. The ALJ noted that on March 13, 2012, claimant presented to a hospital complaining of lower extremity edema present for three weeks. (AR 18). "She reported that she stood for eight hours a day and did not elevate feet." (*Id.*). She was diagnosed with dependent edema due to prolonged standing and obesity. (*Id.*). Claimant was seen again January 2013 and was prescribed a diuretic and potassium due to her lower extremity swelling. (*Id.*). An examination in February 2013 noted her obesity, but was otherwise had normal findings. (AR 19). The ALJ noted that the record indicates that claimant has not experienced significant swelling since early 2013 and has not sought treatment for leg swelling since that time. (AR 20).

The ALJ discussed claimant's testimony regarding her alleged need to elevate her legs as well. The ALJ found "claimant's testimony regarding how often she had to elevate her legs was ambiguous." (*Id.*). The ALJ noted that, "[i]nitially the claimant alleged she had to elevate her legs all day every day at hip level, however upon further questioning from her representative, she clarified that she had to elevate her legs 4-5 times per day." (*Id.*).

The ALJ also addressed the January 25, 2013, recommendation that claimant elevate her legs (AR 706), giving it little weight. (AR 22). The ALJ found the recommendation vague because it did not say how high, how often, or for how long claimant needed to elevate her legs. (*Id.*). Moreover, the ALJ again noted the absence of any medical evidence of ongoing, prolonged swelling of claimant's lower extremities. (AR 22). The ALJ concluded, however, that "[t]o reduce the possibility of swelling

15

related to the obesity [claimant] needs the ability to elevate her legs six inches off the ground." (AR 21, 22).

Again, it is the claimant's responsibility to prove her residual functional capacity. *Stormo*, 377 F.3d at 806. The only evidence in the record that claimant needed to elevate her legs to hip height is her own testimony. That is legally insufficient. *Roesler v. Colvin*, No. 12-1982 (JRT/JJK), 2013 WL 4519388, at *22 (D. Minn. Aug. 26, 2013)(affirming an ALJ's refusal to include a limitation for elevating legs, finding that the claimant's subjective claim of a need to elevate her legs to heart level three to four times a day was insufficient to carry her burden). The only extant medical record referencing claimant's need to elevate her legs is the January 25, 2013 entry, which simply reads: "Avoid salt, elevate legs." (AR 706). These words appear as part of the record of an office visit and is under the heading "Assessment/Plan." These recommendations do not constitute an opinion regarding a work limitation. Further, the medical record did not assert that claimant could not work with swollen legs. Thus, although it is true that there is no medical evidence in the record that elevating claimant's legs by six inches would prevent claimant's legs from swelling, this is not a case where the ALJ's six-inch limitation was inconsistent with a medical opinion that they need to be raised higher or longer. *See Andrews v. Astrue*, No. 08-2116, 2009 WL 4573239, at * 5 (W.D. Ark. Dec. 1, 2009) (remanding because, among other things, the ALJ's RFC stated that claimant be able to elevate her legs for "about five-minutes per hour," when the medical opinion was that claimant needed to have her legs on a foot stool whenever sitting at a desk).

In any event, claimant's argument conflates the height of leg elevation needed to relieve swelling with the height of leg elevation needed to work. In other words, claimant may still work even with swollen legs. This was demonstrated when in 2012 she saw a doctor for treatment for leg swelling after working eight hour shifts while standing. Her

doctor instructed claimant to use compression stockings and elevate her legs when not working, but did not indicate that she was unable to work with swollen legs. (AR 582-86). The ALJ found that claimant's obesity was an impairment. Her past experience with swollen legs was a symptom of her obesity when working long hours on her legs. The ALJ did not find claimant had an impairment of swollen legs; to the contrary, the ALJ found there was no medical evidence supporting claimant's assertion that she had an ongoing problem with swollen legs.

In understanding the lack of significance of the ALJ's height limitation, it is important to reiterate that the ALJ found there was no medical evidence to support claimant's assertion that she continued to suffer from swollen legs after early 2013. The ALJ concluded that it was reasonable to include a prophylactic limitation for claimant to be able elevate her legs by six inches in order to help *prevent* the *possibility* of swollen legs. The fact the ALJ specified six inches, versus three inches or twelve inches, is of little practical import when the record is devoid of any medical evidence or opinion that claimant continued to suffer from swollen legs or needed to elevate her legs to hip height. *Cf. Skeen v. Astrue*, No. 10-4037-SSE-CV-C-MJW, 2011 WL 1113443, at *2 (W.D. Mo. Mar. 24, 2011) (affirming an ALJ's residual functional capacity limitation that claimant should be able to elevate her legs during breaks and on her lunch hour, although there was no specific medical evidence about how often she should be able to elevate her legs). When, as here, the medical evidence fails to show that claimant had on-going, prolonged issues with swelling legs that would necessitate any limitation on the elevation of her legs while working, the ALJ's somewhat arbitrary limitation of six inches is immaterial and does not justify a remand. *See Arkansas v. Oklahoma*, 503 U.S. 91, 109 n.13 (1992) (immaterial flaw by ALJ will not justify remand).

Nor has claimant carried her burden of showing that the ALJ erred by not developing the record further regarding how high she would need to elevate her legs. As

17

noted, there was no medical evidence showing leg swelling after early 2013, and no medical opinion that claimant needed to elevate her legs as a work limitation. Claimant cannot show, therefore, that the ALJ's failure to further develop the record on this issue was either unfair or prejudicial.

### VI. CONCLUSION

For the aforementioned reasons, the ALJ's decision is hereby **affirmed**.

**IT IS SO ORDERED** this 20th day of June, 2018.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa